

1    **FOR PUBLICATION**

FILED

AUG - 6 2012

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

3    **UNITED STATES BANKRUPTCY COURT**

4    **EASTERN DISTRICT OF CALIFORNIA**

6   In re:

7   CITY OF STOCKTON, CALIFORNIA,        Case No. 12-32118-C-9

8            Debtor.                     Adversary No. 12-2302

9   ─────────────────────────────

         ASSOCIATION OF RETIRED            **OPINION**

10  EMPLOYEES OF THE CITY OF
    STOCKTON, a Nonprofit

11  California Corporation,
    SHELLEY GREEN, PATRICIA

12  HERNANDEZ, REED HOGAN, GLENN

13  E. MATTHEWS, PATRICK L.
    SAMSELL, ALFRED J. SIEBEL,

14  BRENDA JO TUBBS, TERI
    WILLIAMS, on Behalf of

15  Themselves and Others
    Similarly Situated,

16
             Plaintiffs,

17
    v.

18
    CITY OF STOCKTON, CALIFORNIA,

19
             Defendant.

20  ─────────────────────────────

21

22        Before: Christopher M. Klein
          United States Bankruptcy Judge

23

24  G. Scott Emblidge (argued), Rachel J. Sater, Kathryn J. Zoglin,
    Moscone Emblidge & Sater LLP, San Francisco, California,

25  for Plaintiffs.

26  Marc A. Levinson (argued), Norman C. Hile, John W. Killeen,
    Orrick, Herrington & Sutcliffe LLP, Sacramento, California,

27  for Defendant.

28

KLEIN, Bankruptcy Judge:

The retired employees of the City of Stockton want this court to order the City to keep paying for their health benefits during this chapter 9 case.  The difficulty is that 11 U.S.C. § 904 forbids the court from using any of its powers to "interfere with" property or revenues of a chapter 9 debtor. Accordingly, although the City's unilateral interim reduction of retiree health benefit payments may lead to tragic hardships for individuals in the interval before their claims are redressed in a chapter 9 plan of adjustment, the motion for injunctive relief must be DENIED.  No relief being available and determining that this is an "arising in" core proceeding under 28 U.S.C. § 1334(b) and § 157(b)(2), the adversary proceeding will be DISMISSED.

### Procedural Posture

This adversary proceeding was filed as a class action by the Association of Retired Employees of the City of Stockton ("ARECOS") and eight retirees on July 10, 2012, together with an Application for Temporary Restraining Order ("TRO") or Preliminary Injunction or in the Alternative Relief From Stay.

The retirees contend they have vested contractual rights that are protected from impairment by the Contracts Clause of the United States Constitution, a similar clause in the California Constitution, and by other provisions of California law.

The complaint, the application for injunctive relief, and the supporting papers conspicuously omit reference to § 904,

which operates as an anti-injunction statute and bars the court, without the municipality's consent, from interfering with its political or governmental powers, property or revenues, and use or enjoyment of income-producing property.

The court set the TRO/preliminary injunction hearing for July 23, 2012, and ordered the parties to brief the question of the effect of § 904 on this adversary proceeding.  It further ordered the City to state whether, as permitted by § 904, it consents to this court resolving the interim health benefit payment dispute.  Notice was also given that the court might dismiss the adversary proceeding on its own motion if it concludes that § 904 prevents all of the relief being sought.

At the July 23 hearing, the parties addressed all facets of the adversary proceeding, questions of jurisdiction, and judicial authority.  The City did not consent to permit this court to resolve the interim health benefit payment dispute.  This decision announces and explains the court's ruling.

### Facts

The City of Stockton filed this chapter 9 case on June 28, 2012.  The questions of the City's eligibility for chapter 9 relief and whether to order relief are the subject of a separate process progressing under a schedule fixed by the court.

The Stockton City Council adopted a budget for the Fiscal Year commencing July 1, 2012, that, by state law, must be balanced.  The required balance was achieved by cutting costs,

1  including unilaterally reducing retiree health benefits.

2      This adversary proceeding seeks:  an injunction prohibiting

3  the City from implementing the retiree health benefit reduction;

4  a declaration that the changes are unlawful; and an order

5  compelling the City to pay for the retiree health benefit for all

6  retirees entitled to it as of July 1, 2012; and attorney fees.[1]

7      For purposes of the present analysis (but without deciding

8  the question), the retiree health benefits are regarded as

9  bargained-for and vested contractual rights.

10      Persons whose benefits have been reduced may file proofs of

11  claim that must be addressed in a plan of adjustment under the

12  standards prescribed in the Bankruptcy Code for confirming plans.

13

14                          Discussion

15      Since the complaint relies on the supposed inability of the

16  _____

17  [1]The prayer in the complaint seeks:

18      1.  A temporary, preliminary and permanent injunction
    prohibiting the City from implementing the changes to the
19  Retiree Health Benefit;
        2.  A declaration under 28 U.S.C. § 2201 (The Declaratory
20  Relief Act) that the City Retirees have a vested property
    interest in the Retiree Health Benefit and that the City's
21  proposed changes eliminating the Retiree Health Benefit are
    unlawful;
22      3.  An order compelling the City to maintain the Retiree
    Health Benefit with respect to the ARECOS' members and Class
23  Plaintiffs and all other City of Stockton retirees entitled
    to the Retiree Health Benefit as of July 1, 2012.
24      4.  For an award of reasonable attorney's fees and costs
25  under California Civil Code §§ 1021.5 and 1033.5; California
    Government Code §§ 800 and 31536; 42 U.S.C. § 1988, and any
26  other statute or rule of law authorizing such an award; and

27  Complaint, Prayer for Relief (catchall omitted).

28                             4

City to impair contracts, we begin with basic points of constitutional law and history that give context to the § 904 limitation on the court's authority.  Then the focus shifts to how the plaintiffs' due process rights are protected, and thence to the jurisdictional and procedural status of this proceeding.

I

This adversary proceeding is premised at bottom on the Contracts Clause of the United States Constitution:  "No State shall ... pass any ... Law impairing the Obligation of Contracts."  U.S. CONST., art. I, § 10, cl. 1.

Counsel clarified in open court that an immutable Contracts Clause is the centerpiece of plaintiffs' case.  The first cause of action is: "Impairment of Contract – U.S. Constitution" and alleges that in "unilaterally changing the terms of the Retiree Health Benefit, the City impaired contractual obligations, in violation of Article I section [10] of the United States Constitution and 42 U.S.C. § 1983."  Complaint, ¶ 56.  The other causes of action flow from that premise.[2]  The premise is flawed.

---

[2]The second paragraph of the complaint states the theory:

> 2.  This action seeks a temporary restraining order and declaratory and injunctive relief to stop the City from cutting health insurance premium payments for its retired employees.  Termination of these health benefits is unlawful because the benefits are a form of deferred compensation which the City's retirees have already earned; therefore, the retirees have a vested right to these benefits protected by the contract clauses of the United States and California Constitutions.  Moreover, if the City is permitted to terminate retiree health benefits as planned, it will

5

1    While the Contracts Clause is a key navigational star in the

2  firmament of our Constitution and economic universe, it is

3  subject to being eclipsed by the Bankruptcy Clause:  "The

4  Congress shall have Power to ... establish ... uniform Laws on

5  the subject of Bankruptcies throughout the United States."  U.S.

6  CONST., art. I, § 8, cl. 4.

7    Significantly, the Contracts Clause bans a <u>state</u> from making

8  a law impairing the obligation of contract; it does not ban

9  <u>Congress</u> from making a law impairing the obligation of contract.

10 This asymmetry is no accident.

11   The Bankruptcy Clause necessarily authorizes Congress to

12 make laws that would impair contracts.  It long has been

13 understood that bankruptcy law entails impairment of contracts.

14 <u>Sturges v. Crowninshield</u>, 17 U.S. (4 Wheat.) 122, 191 (1819).

15   In <u>Sturges</u>, the Supreme Court reasoned that Congress "is

16 expressly vested with the power of passing bankrupt laws, and is

17 not prohibited from passing laws impairing the obligation of

18 contracts, and may, consequently, pass a bankrupt law which does

19 impair it; whilst the states have not reserved the power of

20 bankrupt laws, and are expressly prohibited from passing laws

21 impairing the obligation of contracts."  <u>Id</u>.

22   In 1936, the Supreme Court noted that the "especial purpose

23

24
      immediately endanger the lives of scores of elderly and ill
25    retirees and their dependents who are financially unable to
      purchase health insurance.  This Court's intervention is
26    desperately needed to forestall preventable, imminent harm.

27 Complaint, ¶ 2.

28                              6

of all bankruptcy legislation is to interfere with the relations between the parties concerned — to change, modify, or impair the obligation of their contracts." Ashton v. Cameron Cnty. Water Improvement Dist. No. 1, 298 U.S. 513, 530 (1936).

Again, in its 1938 decision validating the second municipal insolvency statute, the Court explained that the "natural and reasonable remedy through composition" is not available under state law "by reason of the restriction imposed by the Federal Constitution upon the impairment of contracts by state legislation" but the "bankruptcy power is competent to give relief." Hence, a state, by authorizing a municipality to file a case, legitimately "invites the intervention of the bankruptcy power to save its agency which the State itself is powerless to rescue." United States v. Bekins, 304 U.S. 27, 54 (1938).

In other words, while a state cannot make a law impairing the obligation of contract, Congress can do so. The goal of the Bankruptcy Code is adjusting the debtor-creditor relationship. Every discharge impairs contracts. While bankruptcy law endeavors to provide a system of orderly, predictable rules for treatment of parties whose contracts are impaired, that does not change the starring role of contract impairment in bankruptcy.

It follows, then, that contracts may be impaired in this chapter 9 case without offending the Constitution. The Bankruptcy Clause gives Congress express power to legislate uniform laws of bankruptcy that result in impairment of contract; and Congress is not subject to the restriction that the Contracts

7

Clause places on states.   Compare U.S. CONST. art. I, § 8, cl. 4, with § 10, cl. 1.   Hence, the key premise of the centerpiece of this lawsuit rests on infirm constitutional ground.

The federal bankruptcy power also, by operation of the Supremacy Clause, trumps the similar contracts clause in the California state constitution.   U.S. CONST. Art. VI, cl. 2; CAL. CONST. Art. I, § 9 ("A bill of attainder, ex post facto law, or law impairing the obligation of contracts may not be passed."); Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo (In re City of Vallejo), 432 B.R. 262, 268-70 (E.D. Cal. 2010), aff'g, 403 B.R. 72, 76-77 (Bankr. E.D. Cal. 2009).   For the same reason, the plaintiffs' other theories also fall.

In sum, even if the plaintiffs' benefits are vested property interests, the shield of the Contracts Clause crumbles in the bankruptcy arena.

## II

A delicate state-federal relationship of mutual sovereigns in which the Tenth Amendment looms large provides the framework for municipal bankruptcy and gives context to this dispute.

## A

A pair of chapter 9 provisions honors state-federal balance by reserving certain state powers and by correlatively limiting the powers of the federal court:   11 U.S.C. §§ 903 and 904.

1

Section 903 reserves to the state the power to control political and governmental powers, as well as expenditures:

§ 903.   Reservation of State power to control municipalities

This chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality, including expenditures for such exercise, but —
(1) a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition; and
(2) a judgment entered under such a law may not bind a creditor that does not consent to such composition.

11 U.S.C. § 903.

This reservation is limited by the Supremacy Clause.   A state cannot rely on the § 903 reservation of state power to condition or to qualify, i.e. to "cherry pick," the application of the Bankruptcy Code provisions that apply in chapter 9 cases after such a case has been filed.   Mission Indep. School Dist. v. Texas, 116 F. 175, 176-78 (5th Cir. 1940) (chapter IX); Vallejo, 403 B.R. at 75-76; In re City of Stockton, 2012 Westlaw 2905523 at *4 - *5 (Bankr. E.D. Cal. 2012) ("Stockton I"); In re Cnty. of Orange, 191 B.R. 1001, 1021 (Bankr. C.D. Cal. 1996).

While a state may control prerequisites for consenting to permit one of its municipalities (which is an arm of the state cloaked in the state's sovereignty) to file a chapter 9 case, it cannot revise chapter 9.   Stockton I, at *4 - *5.   For example, it cannot immunize bond debt held by the state from impairment. Mission Indep. School Dist., 116 F. at 176-78.

2

Section 904 complements § 903.  In view of the inability of a state to control or condition chapter 9 proceedings after the municipal case is filed with the state's permission, § 904 imposes limits on the federal court to assure that powers reserved to the states are honored:

> § 904 Limitation on jurisdiction and powers of court
>
>     Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with —
>     (1) any of the political or governmental powers of the debtor;
>     (2) any of the property or revenues of the debtor; or
>     (3) the debtor's use or enjoyment of any income-producing property.

11 U.S.C. § 904.

As the construction of § 904 is central to the instant matter, its history is important.

The statutory limit on the authority of the court that is now § 904 has been enacted four times.  Each revision has reduced the latitude within which the court can act.  The limit has come to be described as "absolute."

The overall goal is a balance that does not offend the Tenth Amendment:  "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, or to the people."  U.S. Const. amend. X.

B

The evolution of the limit on court authority in what is now

§ 904 — from 1934 to its current version — is instructive. Perceived defects in the limit were a basis for invalidating the first municipal bankruptcy law as unconstitutional.  Ever since, Congress has keep a weather eye on the constitutionality problem.

1

The first enactment of the limit on court authority was in the first municipal bankruptcy law in 1934:

> The judge ... (11) shall not, by any order or decree, in the proceeding or otherwise, interfere with (a) any of the political or governmental powers of the taxing district, or (b) any of the property or revenues of the taxing district necessary <u>in the opinion of the judge</u> for essential governmental purposes, or (c) any income-producing property, unless the plan of readjustment so provides.

Bankruptcy Act § 80(c)(11), Act of May 24, 1934, 48 Stat. 801 (emphasis supplied).

The Supreme Court disapproved the 1934 statute as an unconstitutional interference with the sovereignty of a state on two theories.  First, structurally, municipal bankruptcy was an impossible contradiction of federalism.  Second, the particular statutory terms might enable the federal government to impose its will on an unwilling sovereign state.  <u>Ashton</u>, 298 U.S. at 532.

Although the <u>Bekins</u> Court repudiated <u>Ashton</u>'s structural objection when validating the 1937 municipal bankruptcy act, the second <u>Ashton</u> rationale has endured and has influenced Congress always to confine its exercise of the bankruptcy power to measures that do not usurp state sovereignty.

2

Congress reacted to <u>Ashton</u> in 1937 by reenacting the municipal bankruptcy provisions with revisions designed to reduce the opportunity for excessive federal control over state sovereignty.  Act of Aug. 16, 1937, 50 Stat. 653.

One significant change was deletion of the phrase "in the opinion of the judge" so as to make the concept of "property or revenues necessary for essential services" less dependant on the subjective view of a federal judge.

The revised provision, with that deletion and with shifts in nomenclature from "taxing district" to "petitioner" and "plan of arrangement" to "plan of composition," was otherwise unchanged:

> The judge ... shall not, by any order or decree, in the proceeding or otherwise, interfere with (a) any of the political or governmental powers of the petitioner; or (b) any of the property or revenues of the petitioner necessary for essential governmental purposes; or (c) any income-producing property, unless the plan of composition so provides.

Bankruptcy Act § 83(c), Act of Aug. 16, 1937, 50 Stat. 657.

The Supreme Court validated the 1937 municipal bankruptcy statute in <u>Bekins</u>, reasoning that it was a cooperative enterprise by state and federal sovereigns that was carefully drawn so as not to infringe state sovereignty.  <u>Bekins</u>, 304 U.S. at 51.  It emphasized that a state "retains control of its fiscal affairs" and that "no control or jurisdiction over that property and those revenues of the petitioning agency necessary for essential governmental purposes is conferred" on the federal court.  <u>Id</u>.

3

.The third version of the statutory limit on court authority
was part of a modernization of former Bankruptcy Act chapter IX
in 1976.  Act of Apr. 8, 1976, Pub. L. 94-260, 90 Stat. 315.

The statutory limit changed in three important respects.
First, the municipality could consent to exercise of otherwise-
prohibited federal judicial authority.  Second, it was clarified
that the limitation applied to stays, including automatic stays.
Third, the qualification "necessary for essential government
services" was deleted from the ban on interference with property
or revenues of the debtor.

This 1976 version, new Bankruptcy Act § 82(c), provided:

> (c) LIMITATION. — Unless the petitioner consents or the
> plan so provides, the court shall not, by any stay, order or
> decree, in the case or otherwise, interfere with —
> (1) any of the political or governmental powers of the
> petitioner;
> (2) any of the property or revenues of the petitioner;
> or
> (3) the petitioner's use or enjoyment of any income-
> producing property.

Bankruptcy Act § 82(c), Act of Apr. 8, 1976, 90 Stat. 316.

Congress made plain that it was preserving the strict
limitation on judicial interference with political or
governmental powers, property or revenue, or income-producing
property based on <u>Ashton</u> and <u>Bekins</u> and their progeny:  the
Supreme Court and Courts of Appeals have "made it very clear that
the jurisdiction of the court 'is strictly limited to
disapproving or to approving and carrying out a proposed
composition.'  The bill follows these holdings and retains the

13

limitation on the court's power."  H.R. Rep. No. 94-260, 94th

Cong., 1st Sess., at 9-10, reprinted in 1976 USCCAN at 547-48.[3]

The deletion of the phrase "necessary for essential

government services" from § 82(c)(2) aimed to broaden the

limitation.  The words "necessary" and "essential" invited

unnecessary litigation.  The "governmental services" language

reflected an obsolete distinction between governmental and

proprietary functions that the Supreme Court abolished in 1946.

The phrase overlapped and confused the related ban on judicial

interference with income-producing property.[4]

---

[3]And:

   Subsection (c) repeats and broadens the limitation in
section 83(c), paragraph 1, of current law on the power
granted to the court under subsection (b) and elsewhere in
the chapter, by prohibiting any interference by the court,
by any order or decree, in any of the political or
governmental powers of the petitioner; any of the property
or revenues of the petitioner, or which is used or enjoyed
by the petitioner.  The Committee feels that this limitation
is required by Ashton and Bekins [citations omitted], which
defined the limits of Congress' power under the bankruptcy
clause, and the extent to which Congress may grant power to
the courts to assist in the management of the affairs of a
distressed municipality.

H.R. Rep. No. 94-260, 94th Cong., 1st Sess., at 18, reprinted in
1976 USCCAN at 556.

[4]The House Committee explained:

   The second change broadens the limitation by eliminating
the phrase "necessary for essential governmental services"
from the second paragraph of the subsection.  The phrase was
deleted for three reasons.  First, the words "necessary" and
"essential" were conducive to litigation.  Second, and more
importantly, the Supreme Court in New York v. United States,
326 U.S. 572, abolished the distinction between governmental
and proprietary functions.  Thus, it is now appropriate to

14

4

The 1976 version was reenacted in 1978 as 11 U.S.C. § 904 with the addition of the preambular phrase "Notwithstanding any power of the court."

This additional limiting language forbids resort to a federal court's inherent or equitable powers.  It reflects reinvigorated sensitivity in 1978 by Congress to the need to avoid unnecessary intrusions of state sovereignty in order to obviate the risk of invalidation by the Supreme Court.

That heightened concern stemmed, in part, from the Supreme Court's then-recent invocation of the Tenth Amendment to invalidate part of a labor statute.  <u>Nat'l League of Cities v. Usery</u>, 426 U.S. 833, 842-52 (1976), <u>overruled</u>, <u>Garcia v. San Antonio Metro. Transit Auth.</u>, 469 U.S. 528, 531 (1985).

<u>Usery</u> worried the drafters of the Bankruptcy Code.  The

prohibit interference by the court in any of the municipalities' functions, for they are all equally governmental functions.
    Third, the limitation, on interference with any income-producing property, seems to deprive the qualification "essential for necessary governmental services" of any effect.  Under one, the court is denied the power to interfere with property necessary for governmental services; under the other, the court may not interfere with any income-producing property.  There is conceivably a third category of property, non-income-producing property that is not necessary for essential governmental services, but the existence of that category does not warrant the potential for litigation that exists with the old language.  In any case, no constitutional problem is anticipated, because the power of the court to interfere with the petitioner is further limited by the change.

H.R. Rep. No. 94-260, 94th Cong., 1st Sess., at 18, <u>reprinted in</u> 1976 USCCAN at 556 (footnote omitted).

House Committee noted, the "Usery case underlines the need for this limitation on the court's powers" and added that § 904 "makes clear that the court may not interfere with the choices a municipality makes as to what services and benefits it will provide to its inhabitants." H.R. Rep. No. 95-595, at 398.  Even though later overruled, Usery is a reminder that the Tenth Amendment is a brooding presence over the chapter 9 landscape.

### C

The message derived from this history regarding the power of this court to interfere with the City's actions regarding retiree health benefits compels the conclusion that § 904 prevents any federal court from doing what the plaintiffs request, regardless of whether the City's action is fair or unfair.

The concern has constitutional proportions.  Chapter 9 passed constitutional muster on the basis that the federal bankruptcy power be exercised at the request of, but not at the expense of, the sovereign state in an exercise of cooperation among sovereigns.  Bekins, 304 U.S. at 51-53 (here "we have coöperation to provide a remedy for a serious condition in which the States alone were unable to afford relief.").

As a state-federal cooperative enterprise conducted in delicate circumstances in which state sovereignty must be respected, Congress has been sedulous to assure that the bankruptcy power not be used in municipal insolvencies in a manner that oversteps delicate state-federal boundaries.

1    The entire structure of chapter 9 has been influenced by

2   this pervasive concern to preserve the niceties of the state-

3   federal relationship.  The foundation involves multiple levels of

4   consent.  No chapter 9 case can be filed other than a voluntary

5   case filed by the municipality with the consent of the state.  11

6   U.S.C. § 109(c)(2).  The municipality consents by filing the

7   voluntary case.  11 U.S.C. § 301, incorporated by § 901(a).

8   Consent is implicit in the restriction that only the municipality

9   can propose a plan of adjustment.  11 U.S.C. § 941.  Another

10  consent is the express consent recognized in § 904 that the City

11  has declined to give in this proceeding.  11 U.S.C. § 904.

12     Other provisions further the Constitutional restriction

13  against encroaching on state sovereignty.  For example, the

14  Bankruptcy Code's restrictions on use, sale, or lease of property

15  do not apply in chapter 9.  Compare 11 U.S.C. § 901(a), with id.

16  § 363.  Nor is there provision for a trustee or examiner in a

17  chapter 9 case.  Compare 11 U.S.C. § 901(a), with id. § 1104.

18     In the overall construct, § 904 performs the role of the

19  clean-up hitter in baseball.  Its preambular language

20  "[n]otwithstanding any power of the court, ... the court may not,

21  by any stay, order, or decree, in the case or otherwise ..." is

22  so comprehensive that it can only mean that a federal court can

23  use no tool in its toolkit — no inherent authority power, no

24  implied equitable power, no Bankruptcy Code § 105 power, no writ,

25  no stay, no order — to interfere with a municipality regarding

26  political or governmental powers, property or revenues, or use or

27

28                                  17

enjoyment of income-producing property.   11 U.S.C. § 904.   As a practical matter, the § 904 restriction functions as an anti-injunction statute — and more.

In short, the § 904 limitation on the court's authority is absolute, with only the two exceptions stated in § 904:   consent; and provision in a plan of adjustment (which can only be proposed by the municipality).   6 COLLIER ON BANKRUPTCY ¶ 904.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011) ("COLLIER").

III

The plaintiffs contend that § 904 does not apply and does not prevent the relief sought.   They say they challenge only the role of the City as employer, not as governmental regulator, and that neither § 904(1) nor § 904(3) is implicated.   While that argument is weak, § 904(2) is dispositive.

A

Conceding that the § 904(2) prohibition on interfering with the debtor's "property or revenues" poses an obstacle, plaintiffs argue[5] that their relief would be an innocuous preservation of the status quo that would not directly interfere with City property or revenues, and would not indirectly interfere with

---

[5]Supplemental Brief in Support of Application for Temporary Restraining Order and Preliminary Injunction or in the Alternative Relief From Stay, at 3 ("Retirees simply seek an order to preserve the status quo by prohibiting the City from unilaterally modifying Plaintiffs' vested and constitutionally-protected right to their earned benefits.").

revenues, because the retirees' rights to the health benefit is
fixed and immutable.   That argument is not persuasive.

Coercively preserving a status quo that entails payment of
money from the City treasury interferes with the City's choice to
suspend such payments.   The contents of the City treasury are
"property or revenues" within the meaning of § 904(2).

It is impossible to envision how granting the plaintiffs'
prayer for an "order compelling the City to maintain the Retiree
Health Benefit with respect to ARECOS members and Class
Plaintiffs and all other City of Stockton retirees entitled to
the Retiree Health Benefit as of July 1, 2012," and to pay
attorney's fees, would not require the payment of money from the
City's property or revenues.   In fact, payment would be required.

It follows that the relief sought is barred by § 904(2) as
an interference with the City's "property or revenues."


                                B


That a TRO was issued in the Orange County chapter 9 case
does not compel the conclusion that a TRO is permitted here.   The
TRO in that case required that certain employees who had
nominally been "permanently" laid off instead be treated as
"temporarily" laid off, and required the parties to meet and
confer to work out their differences.   Orange Cnty. Emps. Ass'n
v. Cnty. of Orange (In re Cnty. of Orange), 179 B.R. 177, 185
(Bankr. C.D. Cal. 1995) ("Orange County").   It does not appear
the "property or revenues" were being interfered with; it also

19

1   was noted that the parties thereafter settled apparently before a

2   monetary consequence ensued.  Id. at 185, n.21.

3        Another distinction is that the Orange County TRO related to

4   the process of assuming or rejecting unexpired collective

5   bargaining agreements as § 365 executory contracts.  11 U.S.C.

6   § 365; NLRB v. Bildisco & Bildisco, 465 U.S. 513, 521-23 (1984)

7   ("Bildisco"); Orange County, 179 B.R. at 183.

8

9                               1

10       The formal statutory analysis is as follows.  The § 365

11  executory contract provisions apply in chapter 9 cases by virtue

12  of § 901(a).  11 U.S.C. § 901(a), incorporating id. § 365.

13       Sovereign immunity of a municipality is abrogated as to

14  § 901.  11 U.S.C. § 106(a)(1).[6]  All chapter 1 provisions,

15  including § 106(a)(1), apply in chapter 9.  11 U.S.C. § 103(f).[7]

16       Since § 901(a) lists sections from chapters other than

17

18       [6]The section provides, in relevant part:

19
         (a) Notwithstanding an assertion of sovereign immunity,
20       sovereign immunity is abrogated as to a governmental unit to
         the extent set forth in this section with respect to the
21       following:
         (1) Sections ..., 901, 922, 926, 928, 929, 944, ... .
22
23  11 U.S.C. § 106(a)(1).

24       [7]The section provides:

25       (f) Except as provided in section 901 of this title, only
         chapters 1 and 9 of this title apply in a case under such
26       chapter 9.

27  11 U.S.C. § 103(f).

28                              20

chapters 1 or 9 that apply in chapter 9 cases, including § 365,
it follows that the municipality's sovereign immunity is
abrogated with respect to executory contracts.

In other words, the municipality's voluntary act of filing a
chapter 9 case triggers two relevant consequences.  First, the
municipality consents, within the meaning of § 904, to
interference by a federal court as to the Bankruptcy Code
provisions that apply in chapter 9 cases.  <u>Vallejo</u>, 403 B.R. at
75-76; <u>In re Cnty. of Orange</u>, 191 B.R. at 1021.  Second,
sovereign immunity is voluntarily abrogated to the extent
provided in § 106.

In short, the naked fact of the issuance of a TRO in <u>Orange
County</u> regarding a § 365 issue did not necessarily offend § 904,
even though the rationale for that TRO seems dubious.[8]  The
county consented under § 904 to federal judicial interference in
the form of assessing the merits of § 365 assumption or rejection

---

[8]<u>Orange County</u> has been criticized as implying that a
municipality cannot unilaterally breach collective bargaining
agreements before formal rejection.  6 COLLIER ¶ 901.04[9][a].
While the decision is opaque and the need for a TRO unclear, the
actual terms of the TRO requiring that certain employees laid off
"permanently" be deemed laid off only "temporarily" (the
difference relating to seniority and grievance procedures), and
requiring the parties to meet and confer, did not directly affect
the County treasury.  It is consistent with a court controlling a
process preliminary to consideration of the reasonable-efforts-
to-negotiate-voluntary-modification prong of <u>Bildisco</u> test for
§ 365 rejection, 465 U.S. at 526-27, that applies collective
bargaining agreements.  It is not necessarily inconsistent with
<u>Bildisco</u>, which permitted contracts to be modified on an interim
basis, subject to later § 365 review. 465 U.S. at 527-34.  Absent
agreement, such contracts ultimately must be rejected with
damages dealt with in the claims process or assumed <u>cum onere</u>.

of executory contracts and waived its sovereign immunity by virtue of § 106 regarding executory contracts.

2

Here, the retiree health benefits are not executory contracts. Performance does not remain due to some extent on both sides — there are no reciprocal obligations with performance due by both parties. <u>Bildisco</u>, 465 U.S. at 522 n.6.

The retirees insist they have performed their side of the bargain:  "The City already exercised its political discretion to provide the Benefit and accepted the full performance by the Retirees of their services to the City to earn the Benefit." Supplemental Brief, at 3.  And, "Each of the ARECOS members and Class Plaintiffs have satisfied their obligations under their respective contracts with the City."  Complaint, ¶ 60.

Under any definition of a § 365 executory contract, the plaintiffs' prior full performance means they have no executory contract.  So viewed, the <u>Orange County</u> TRO regarding an executory contract is inapposite to the question of the effect of § 904(2) on the City's interim cost cutting.

To the contrary, and it is hereby so held, § 904(2) prevents this court from granting the relief requested in this proceeding.

3

Plaintiffs' counsel agreed at oral argument that plaintiffs want the court to impose, by way of its injunctive power, the

22

equivalent of the provisions of Bankruptcy Code § 1114 relating
to "Payment of insurance benefits to retired employees" in
chapter 11 cases even though § 1114 is not specifically made
applicable in chapter 9 cases.    11 U.S.C. § 1114.

Section 1114 was enacted in 1988 to provide procedures and
standards for modifying retiree insurance benefits during a
chapter 11 case.    The basic rule for chapter 11 is that retiree
insurance payments must continue to be made timely during the
case unless and until the court approves a modification.    11
U.S.C. § 1114(g).    Modification requires compliance with a
prescribed negotiation process and prescribed standards to be
applied by the court.    11 U.S.C. §§ 1114(f)-(h).

The retiree insurance benefits provisions were modeled on
§ 1113, which was adopted in 1984 following the Supreme Court's
Bildisco decision that collective bargaining agreements are
executory contracts eligible for rejection under § 365 and that
they may be unilaterally rejected or modified before formal
rejection is approved by the court.    Bildisco, 465 U.S. at 521-
27.    New § 1113 imposed rejection procedures and standards for
chapter 11 cases that were more stringent than the rejection
standards prescribed in Bildisco.

But neither § 1113 nor § 1114 is designated in § 901(a) as
applicable in chapter 9 cases.    11 U.S.C. § 901(a) (omitting
§ 1113 and § 1114).

Contentions that the absence of § 1113 from § 901(a) should
be disregarded as an accident and that courts should apply § 1113

1  in chapter 9, instead of the <u>Bildisco</u> standards, have regularly

2  been rejected. The judicial consensus is that <u>Bildisco</u> controls

3  rejection of collective bargaining agreements in chapter 9 cases.

4  <u>Vallejo,</u> 432 B.R. at 270-72, <u>aff'g</u> <u>Vallejo</u>, 403 B.R. at 77-78;

5  <u>Orange County</u>, 179 B.R. at 183. This court agrees.

6      The delicate constitutional balance that has loomed large

7  over municipal bankruptcy ever since <u>Ashton</u> further cautions

8  against taking liberties to cure perceived legislative mistakes.

9  In chapter 9, where Congress has been careful to observe the

10  delicacies of the state-federal relationship, it is particularly

11  appropriate to leave to Congress, not the courts, the decision to

12  revise § 901(a). See <u>Vallejo</u>, 432 B.R. at 272.

13      The logic focused on the structure of chapter 9, and the

14  attendant importance of § 901(a) in the context of Congress

15  taking care not to overstep the Tenth Amendment constraint,

16  applies as much to § 1114 as to § 1113. The omission of § 1114

17  from § 901(a) warrants the conclusion, for the same reasons as

18  articulated in the <u>Vallejo</u> and <u>Orange County</u> decisions, that

19  § 1114 does not apply in chapter 9 cases.

20      To be sure, this conclusion appears to leave a gap in

21  chapter 9 cases in the sense that some retiree insurance benefits

22  are protected from modification by <u>Bildisco</u>'s § 365 rejection

23  standards because they are included in collective bargaining

24  agreements, while others are not. In reality, any gap is less

25  than meets the eye in view of the <u>Bildisco</u> holding that it is not

26  an unfair labor practice for a debtor unilaterally to modify a

27

28                                    24

1  collective bargaining agreement during the interval between the

2  filing of the case and the formal rejection of the executory

3  contract.  <u>Bildisco</u>, 465 U.S. at 527-34.  In other words,

4  regardless of whether the retiree insurance benefit is part of an

5  executory contract or not, the benefit can be modified or

6  suspended during the pendency of the case.

7

8                                   IV

9       The argument that the City has imposed a plan of adjustment

10 without meeting fundamental requirements of due process, and in

11 circumvention of plan confirmation standards, relies on the false

12 premise that the City's so-called "Pendency Plan" adopted for use

13 during the chapter 9 case is a plan of adjustment.

14

15                                   A

16      The pendency plan is <u>not</u> a plan of adjustment.  A formal

17 plan of adjustment must be filed as such, either with the

18 petition or at such later time as the court fixes.  11 U.S.C.

19 § 941.  No plan was filed with the petition in this case.  No

20 plan has yet been filed.  This court has not yet fixed a time for

21 filing such a plan.  If and when such a plan is filed, the

22 confirmation of the plan will be considered under the standards

23 prescribed by the statute.  11 U.S.C. § 943.

24      Rather, the pendency plan is an interim survival mechanism

25 that enables the financially embarrassed municipality, in the

26 political and governmental judgment of its governing body, to

27

28                                   25

1  continue to provide what it deems to be essential governmental
2  services during the interval between the filing of a chapter 9
3  case and the confirmation of a plan of adjustment.

4      Suspending payment of various obligations during a case
5  under the Bankruptcy Code is a routine aspect of the
6  reorganization process.  When the Supreme Court clarified in
7  Bildisco that it is not an unfair labor practice for a chapter 11
8  debtor unilaterally to implement changes to a collective
9  bargaining agreement — i.e. unilaterally to breach it — before
10 the bankruptcy court acts on a § 365 motion to reject the
11 contract, it necessarily determined that such unilateral changes
12 do not offend due process.  Bildisco, 465 U.S. at 327-34.  The
13 rationale is that upon filing a chapter 11 case, the debtor
14 becomes "empowered by virtue of the Bankruptcy Code to deal with
15 its contracts and property in a manner it could not have done
16 absent the bankruptcy filing."  Id. at 528.

17     Unilaterally-modified contracts are dealt with, as the
18 Supreme Court explained, through conventional bankruptcy law
19 provisions that entitle the victim of a breach of a prepetition
20 obligation to file a proof of claim that will be dealt with in
21 the ordinary claims process and receive the priority provided by
22 the Bankruptcy Code.  Id. at 530 n.12.  It is most unlikely that
23 the Supreme Court, after having impliedly endorsed the process in
24 Bildisco, would regard it as inconsistent with due process.

25     This analysis applies in chapter 9 as § 365 applies in
26 municipality cases.  11 U.S.C. § 901(a), incorporating id. § 365.

27

28                              26

1    The plaintiffs have prepetition claims that, under their own

2  theory of the case, are not executory contracts as they fully

3  performed their bargains before bankruptcy.  As noted, they may

4  file proofs of claim on account of their retiree health benefits

5  that will be addressed and valued during the claims adjustment

6  process.  11 U.S.C. §§ 501-02.  In addition, any claim that

7  appears on the list of creditors that the City must file is

8  deemed "filed," and hence "allowed," if not listed as disputed,

9  contingent, or unliquidated.  11 U.S.C. § 925.

10    The plan of adjustment, when it is filed, will be confirmed

11  only if it meets the pertinent statutory confirmation standards.

12  11 U.S.C. § 943.  The plaintiffs will be entitled to accept or

13  reject the plan.  11 U.S.C. § 1126(a), incorporated by § 901(a);

14  Fed. R. Bankr. P. 3018.  They also will be entitled to object to

15  confirmation.  Fed. R. Bankr. P. 3020(b).

16    The right to present claims, have them evaluated, to accept

17  or reject the plan, and to object to confirmation is all the

18  process that is due.

19

20                              B

21    The real remedy for the plaintiffs lies in participating in

22  the process of formulating a plan of adjustment.  As this court

23  has previously explained, the lessons of recent chapter 9 cases

24  teach that successful plans of adjustment are most likely to be

25  achieved by the parties in interest all coming to the table and

26  participating in bona fide negotiations.  Stockton I, 2012

27

28                              27

Westlaw 2905523 at *9.  Every issue that is resolved by agreement will enhance the prospects for a successful plan of adjustment.

To that end, the court has appointed a judge as standing mediator for this case to facilitate a negotiated solution.

In short, even if injunctive relief were permitted, this court is persuaded that injunctive relief is neither necessary nor appropriate to vindicate the rights of the plaintiffs.

V

Having concluded that injunctive relief is not available as a matter of law and, in any event, is not necessary and not appropriate, the alternative of relief from the automatic stay under 11 U.S.C. § 362 warrants discussion.

The City is correct that plaintiffs' request for stay relief is procedurally incorrect.  Stay relief is a matter of general interest to all creditors (not merely the parties to this adversary proceeding) that needs to be presented by motion in the parent chapter 9 case with appropriate notice.  See Fed. R. Bankr. P. 4001(a) & 9014.  If the court were inclined to grant the relief, it would insist upon procedurally proper notice.

Nevertheless, the court is obliged to construe the rules of procedure so as to secure the just, speedy, and inexpensive determination of every case and proceeding.  Fed. R. Bankr. P. 1001.  Here, analysis of why relief from the automatic stay is not warranted may obviate a subsequent wild goose chase.

The logic of plaintiffs' request is that, if the bankruptcy

court does not have authority to interfere with the City's property or revenues by virtue of § 904, then they should be allowed to go to a forum that does have such authority – i.e., the California state courts. Sometimes, as with a personal injury tort action, that is a good solution. But here it would be fundamentally at odds with basic policy underlying chapter 9.

The core of a chapter 9 case is adjustment of the debtor-creditor relationship. The plaintiffs here are creditors. They want two things: a judgment that their health benefit claims are valid and an order compelling the City to maintain payments for those benefits. Those issues are central to the debtor-creditor relationship to be dealt with, along with every other unhappy creditor, in the collective chapter 9 proceeding.

No separate judicial proceeding is needed to determine the validity of prepetition claims. In this case, a filed proof of claim will be "deemed allowed" unless someone objects, as will a claim listed by the City without being designated as disputed, contingent, or unliquidated. 11 U.S.C. §§ 502(a) & 925.

Any objection to a claim will be litigated in this court under established procedures that honor due process without extensive and expensive satellite litigation. Fed. R. Bankr. P. 3007. Resort to state court would be wasteful of everyone's resources and introduce unnecessary delay and confusion.

For a plan of adjustment to be confirmed as to a class of claims that has not accepted the plan, it must be "fair and equitable" and "not discriminate unfairly." 11 U.S.C.

§ 1129(b)(1), incorporated by id. § 901(a).

If no plan is confirmed, the case must be dismissed in which event the parties are restored to the prebankruptcy status quo. 11 U.S.C. § 349, incorporated by id. § 901(a).

As to the question of a state court compelling the City to pay for benefits during the chapter 9 case, there is another jurisdictional quandary.  All City property, wherever located, as of the commencement of the case is in the exclusive jurisdiction of the United States District Court of which this bankruptcy court is a unit.  28 U.S.C. §§ 151 & 1334(e)(1).  This exclusive jurisdiction could make it difficult to enforce a state-court order requiring payment, and raises fascinating jurisprudential complexities that are best left to another day.

The timing of payment on account of claims is important to the plaintiffs.  The sooner there is agreement regarding their treatment in the collective chapter 9 case, the sooner they will salvage something out of this financial predicament.

Accordingly, the bankruptcy policy of favoring a collective proceeding to work out a comprehensive solution to municipal insolvency counsels against permitting nonbankruptcy litigation that would materially interfere with the reorganization process.

The request for relief from stay will be denied.  If the request were to be revived, it would have to be presented in a procedurally correct manner.

VI

Having established that there will be no TRO, no injunction, and no relief from the automatic stay, as well as having established that the claims-adjudication procedure within the collective chapter 9 case is adequate to establish and vindicate the legitimate interests of the plaintiffs, the question becomes what is left of this adversary proceeding?

The answer is: nothing is left of the adversary proceeding.

The court gave notice that "if this court concludes at or after the July 23, 2012, hearing that 11 U.S.C. § 904 denies jurisdiction to any court exercising authority over the chapter 9 case of the Defendant, then this adversary proceeding will be dismissed on the court's own motion." Order Setting Hearing and Mandatory Briefing Schedule at 2-3. The phrase "any court" refers to any federal trial or appellate judge.

The § 904 question having been answered with a conclusion that the court lacks authority, and it being plain that nothing is left in controversy in this adversary proceeding that is not more appropriately resolved through conventional bankruptcy procedures, the adversary proceeding is appropriate to dismiss.

VII

The final question is whether this court is permitted to enter an order dismissing the adversary proceeding. The answer turns on a two-step analysis focused on the subject-matter jurisdiction statute, 28 U.S.C. § 1334, and then on bankruptcy's

31

1  judicial administration allocation, 28 U.S.C. § 157.

2

3                                    A

4       Since who the plaintiffs are and what they want influences

5  the analysis at each level, the starting point is to clarify

6  their status in the bankruptcy case.

7       The plaintiffs are "creditors" who have "claims" against the

8  debtor.  Specifically, a "creditor" includes a person with a

9  "claim" against the debtor that arose before the order for

10 relief.  11 U.S.C. § 101(10)(A).[9]

11      The plaintiffs' asserted right to require the City to

12 continue to pay for health benefits based on their prebankruptcy

13 contractual rights are "claims."  11 U.S.C. § 101(5).[10]

14 _____

15      [9]"Creditor" is defined in the Bankruptcy Code:

16      (10) The term "creditor" means —
            (A) entity that has a claim against the debtor that
17 arose at the time of or before the order for relief
    concerning the debtor;
18      (B) entity that has a claim against the estate of a
19 kind specified in section 348(d), 502(f), 502(g), 502(h) or
    502(i) of this title; or
20      (C) entity that has a community claim.

21 11 U.S.C. § 101(10).

22      [10]"Claim" is defined in the Bankruptcy Code:

23      (5) The term "claim" means —
            (A) right to payment, whether or not such right is
24 reduced to judgment, liquidated, unliquidated, fixed,
    contingent, matured, unmatured, disputed, undisputed, legal,
25 equitable, secured, or unsecured; or
            (B) right to an equitable remedy for breach of
26 performance if such breach gives rise to a right to payment,
27 whether or not such right to an equitable remedy is reduced

28                                   32

B

Federal subject-matter jurisdiction is founded on 28 U.S.C. § 1334(b), which confers jurisdiction on the district court over "all civil proceedings arising under title 11, or arising in or related to cases under title 11."

This bankruptcy court exercises § 1334 jurisdiction as a "unit" of the district court of which this bankruptcy judge is a "judicial officer of the district court." 28 U.S.C. § 151.

The allocation of authority as between district judges and bankruptcy judges is governed by 28 U.S.C. § 157. A bankruptcy judge may "hear and determine" and may "enter appropriate orders and judgments" in core proceedings. 28 U.S.C. § 157(b)(1).

In non-core proceedings that are otherwise "related to" a case under title 11, a bankruptcy judge may "hear" but not "determine" the matter, leaving the latter function to a district judge after considering the bankruptcy judge's proposed findings and conclusions and reviewing de novo matters to which a party has timely and specifically objected. 28 U.S.C. § 157(c)(1).[11]

---

to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

[11]That provision is:

(c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and

The parties, however, may consent to have a bankruptcy judge "hear and determine" such a proceeding.

The court has an independent duty to determine the core/non-core status of a proceeding and is not bound by allegations of the parties.   28 U.S.C. § 157(b)(3).[12]

C

Starting with subject-matter jurisdiction, the problem is which category of § 1334(b):  "arising under" title 11; "arising in" a case under title 11; or "related to" cases under title 11.

The plaintiffs' allegation that this action is "related to" a case under title 11 is presented as a naked conclusion with no facts in support.   The syntax of § 1334(b) appears to make the "related to" category a residual catchall to include matters that are not necessarily part of the bankruptcy case.   But the fringes of this category have led to considerable litigation.   1 COLLIER ¶ 3.01[3][e][ii].   The tendency to overuse this category has been

_____

conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

28 U.S.C. § 157(c)(1).

[12]That duty is:

(3) The bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11.   A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.

28 U.S.C. § 157(b)(3).

criticized.   See Ralph Brubaker, On the Nature of Federal

Bankruptcy Jurisdiction: A General Statutory and Constitutional

Theory, 41 Wm. & Mary L. Rev. 743, 862-920 (2000) (arguing "related

to" category is narrower than commonly assumed).   Now that waters

are roiling in the wake of Stern v. Marshall, 131 S.Ct. 2594

(2011), interests of efficient judicial administration make it

important to focus carefully on the § 1334(b) categories.

In this adversary proceeding, the counts in the complaint

assert rights against the City under nonbankruptcy law that might

be considered in a court of general jurisdiction, but the reality

is that this action would not exist in the absence of this

chapter 9 case.   Without the federal bankruptcy power to impair

contracts, the City's unilateral reduction of retiree health

benefits would not be attempted in the first place.   In other

words, but for the existence of this chapter 9 case, there would

be no justiciable dispute.   It follows that this dispute is too

close to the heart of the bankruptcy case to be regarded as

merely "related to" a case under title 11.   The jurisdictional

allegation in the complaint is rejected as incorrect.

The question then becomes whether this dispute "arises under

title 11" or "arises in a case under title 11."

The "arising under" § 1334(b) category has heretofore been

understood to mean causes of action that are created by the

Bankruptcy Code.   1 Collier ¶ 3.01[3][e][i].   The difficulty here

is that under the conventional view, the complaint does not

invoke bankruptcy law; the Bankruptcy Code involvement occurs

when § 904 swoops in from nowhere-mentioned-in-the-complaint to
bar the injunction.   While the City's unilateral interim action
is permitted to occur during a bankruptcy case, title 11 does not
specifically authorize the interim action.   Nor are any of the
plaintiffs' causes of action created by title 11.   In these
circumstances, the fit with the "arising under" category is
uncomfortable; the "arising in" category may be the better fit.
1 COLLIER ¶ 3.01[3][e][iv].

The third § 1334(b) category is the proceeding "arising in"
a case under title 11.   The parameters of this intermediate
category have been poorly outlined in the case law and deserve
more careful attention.   It is argued in the academic literature
that, based on historical jurisprudence, more cases qualify as
"arising in" a case under title 11 than commonly assumed.
Brubaker, 41 WM. & MARY L. REV. at 755, 859-62, 914 n.599.

Regardless of whether the outer dimensions of § 1334(b)
"arising in" jurisdiction may be uncertain, existing case law
discerns such jurisdiction as including proceedings that, while
not based on a right created by title 11, would not exist outside
of bankruptcy.   Harris v. Wittman (In re Harris), 590 F.3d 730,
737 (9th Cir. 2009); Maitland v. Mitchell (In re Harris Pine
Mills, Inc.), 44 F.3d 1431, 1434 (9th Cir. 1995); Eastport
Assocs. v. City of Los Angeles (In re Eastport Assocs.), 935 F.2d
1071, 1076 (9th Cir. 1991); Wood v. Wood (In re Wood), 825 F.2d
90, 97 (5th Cir. 1987); Menk v. LaPaglia (In re Menk), 241 B.R.
896, 909 (9th Cir. BAP 1999).   It is sometimes said that "arising

in" relates to the "administration" of the case. <u>E.g.</u> <u>Wood</u>, 825
F.2d at 97; 1 COLLIER ¶ 3.01[3][e][iv].

Here, the plaintiff creditors allege nonbankruptcy theories
to attack interim measures regarding their claims taken under the
authority of bankruptcy law in the course of administration of
the case.  The basis of the injunction complaint involves the
debtor-creditor relationship between the parties and calls into
question the enforceability of bankruptcy doctrines.  Such a
dispute comfortably fits within the established judicial
construction of the § 1334(b) "arises in" category.  28 U.S.C.
§ 1334(b); <u>Harris</u>, 590 F.3d at 737-38; <u>Menk</u>, 241 B.R. at 909.  It
is also sufficient (but not necessary) that the outcome is
affected by a section of the Bankruptcy Code — § 904.

Accordingly, this proceeding "arises in" a case under title
11, within the meaning of 28 U.S.C. § 1334(b).

D

The next task is to determine whether the proceeding
qualifies as a core proceeding.  Sixteen examples of core
proceedings are listed at 28 U.S.C. § 157(b)(2)(A)-(P).  The list
is not limiting.  11 U.S.C. § 102(3); 1 COLLIER ¶ 3.02[3].  As the
definitions overlap and are nonexclusive, the sixteen categories
are not mutually exclusive and fall into five general categories:
(1) matters of administration; (2) avoidance actions; (3) matters
concerning property of the estate; (4) omnibus categories; and
(5) chapter 15 cases.  1 COLLIER ¶ 3.02[3][a].  The first and

1  fourth categories are implicated in this instance.

2      This lawsuit is a core proceeding on three adequate,

3  independent grounds: §§ 157(b)(2)(A), (B), and (O).

4      Since the gravamen of the complaint challenges interim

5  actions being taken by the City in the course of administering

6  the case, it qualifies as a core proceeding on that basis.  28

7  U.S.C. § 157(b)(2)(A); 1 COLLIER ¶ 3.02[3][a].

8      The determination that the plaintiffs are "creditors" who

9  have "claims" against the debtor implicates core proceeding

10 status regarding "allowance or disallowance of claims" of

11 creditors.  28 U.S.C. § 157(b)(2)(B).  Thus, the demand for a

12 declaratory judgment that plaintiffs have a vested property

13 interest is merely a premature request that this court determine

14 that their claims are allowed; this is the essential routine of

15 the claims administration process.

16     Finally, this chapter 9 involves the adjustment of financial

17 relations between the City and all of its creditors, including

18 the plaintiffs, in a process that will culminate in a chapter 9

19 plan of adjustment.  As such, this proceeding that focuses on the

20 relationship between debtor City and creditor plaintiffs is a

21 core proceeding as an "other proceeding" affecting the

22 "adjustment of the debtor-creditor or the equity security holder

23 relationship."  28 U.S.C. § 157(b)(2)(O); Harris, 530 F.3d at

24 738-40; 1 COLLIER ¶ 3.02[3][d][ii].

25     Therefore, this entire dispute is a "core proceeding" that

26 "arises in" this chapter 9 case that a bankruptcy judge may "hear

27

28                                38

1  and determine" and "enter appropriate orders and judgments"

2  pursuant to 28 U.S.C. § 157(b)(1).

3       The appropriate order in this instance is an order

4  dismissing this adversary proceeding.  The dismissal will be

5  without prejudice to further prosecution of the plaintiffs'

6  claims in the routine course of the reorganization and claims

7  administration process, which process does not ordinarily require

8  an adversary proceeding.

9

10                           Conclusion

11       For the reasons stated, Bankruptcy Code § 904 forbids the

12  injunction requested.  Settled bankruptcy law permits the City to

13  implement interim contractual modifications before the

14  confirmation of a chapter 9 plan of adjustment but such revisions

15  do not, as a matter of law, become permanent unless and until

16  made part of a confirmed plan of adjustment or otherwise

17  voluntarily agreed.  The plaintiffs' substantive claims will be

18  more expeditiously fixed and determined in accordance with

19  principles of due process without the need for this adversary

20  proceeding.  Stay relief is inappropriate because the nature of

21  the dispute is integral to the adjustment of the debtor-creditor

22  relationship that policy dictates occur in a single forum.

23       The remedy for the plaintiffs is to participate in the

24  process of negotiating their treatment under a chapter 9 plan.

25       This is a core proceeding that "arises in" the chapter 9

26  case and would not exist "but for" the chapter 9 case.

27

28                              39

1    Accordingly, orders will be entered DENYING the motion for

2  TRO and preliminary injunction and declining to afford relief

3  from the automatic stay.

4    This adversary proceeding will be DISMISSED, without

5  prejudice to the prosecution by the plaintiffs of their various

6  claims through conventional bankruptcy procedure.

7    Dated:   August 6, 2012.

8

9                    UNITED STATES BANKRUPTCY JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              40

## CERTIFICATE OF SERVICE

On the date indicated below, I served a true and correct copy(ies) of the attached document by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed and by depositing said envelope in the United States mail or by placing said copy(ies) into an interoffice delivery receptacle located in the Clerk's Office.

Marc A. Levinson
400 Capitol Mall #3000
Sacramento CA 95814-4407

Office of the U.S. Trustee
Robert T Matsui United States Courthouse
501 I Street, Room 7-500
Sacramento CA 95814

Jerrold E. Abeles
555 W 5th St 48th Fl
Los Angeles CA 90013

Steven H. Felderstein
400 Capitol Mall #1450
Sacramento CA 95814-4434

Christina M. Craige
555 W 5th St #4000
Los Angeles CA 90013

Alan C. Geolot
1501 K St NW
Washington DC 20005

Guy S. Neal
1501 K St NW
Washington DC 20005

Michael M. Lauter
4 Embarcadero Ctr 17th Fl
San Francisco CA 94111-4109

Robert S. McWhorter
621 Capitol Mall, 25th Floor
Sacramento CA 95814


Allan H. Ickowitz
777 S. Figueroa Street, 34th Floor
Los Angeles CA 90017


Roberto J. Kampfner
633 West Fifth Street Suite 1900
Los Angeles CA 90071


James O. Johnston
555 S Flower St 50th Fl
Los Angeles CA 90071


Scott H. Olson
560 Mission Street, Suite 3100
San Francisco CA 94105


William A. Van Roo
13863 Quaterhorse Dr.
Grass Valley CA 95949


Richard A. Lapping
101 California Street, Ste. 3900
San Francisco CA 94111


Lawrence A. Larose
200 Park Ave
New York NY 10166-4193


Sarah L. Trum
1111 Louisiana 25th Fl
Houston TX 77002


Donna T. Parkinson
400 Capitol Mall Suite 2560
Sacramento CA 95814

David E. Mastagni
1912 I St
Sacramento CA 95811

Robert B. Kaplan
2 Embarcadero Center 5th Fl
San Francisco CA 94111-3824

Nicholas DeLancie
Two Embarcadero Center, 5th Floor
San Francisco CA 94111

John A. Vos
1430 Lincoln Ave
San Rafael CA 94901

Jeffry A. Davis
44 Montgomery St 36th Fl
San Francisco CA 94104

Abigail V. O'Brient
3580 Carmel Mountain Rd #300
San Diego CA 92130

William W. Kannel
1 Financial Center
Boston MA 02111

George S. Emblidge
220 Montgomery St #2100
San Francisco CA 94104

Dated: 8/6/12

_____
DEPUTY CLERK